UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LOIS M. ZURWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-1475-DFH-TAB |
| | ) | |
| COLGATE-PALMOLIVE COMPANY and | ) | |
| HILL'S PET NUTRITION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Lois Zurwell has sued defendants Colgate-Palmolive Company and

Hill's Pet Nutrition, Inc. for violating Title VII of the Civil Rights Act of 1964 and

the Family and Medical Leave Act of 1993 (FMLA).  Zurwell claims that defendants

discriminated against her because she is a woman, failed to prevent or remedy the

sexually hostile work environment her co-workers created, and retaliated against

her for opposing unlawful employment practices against herself and other women.

Zurwell concedes that defendants are entitled to summary judgment on her FMLA

claim, so the motion is granted in that respect.  The court also grants summary

judgment for defendant Colgate-Palmolive on all claims because Colgate-Palmolive

was not Zurwell's employer, as the Seventh Circuit has twice ruled as a matter of

law in related cases involving the same defendants, the same counsel, and co-

workers of Zurwell at the same factory.  *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d

766, 771 (7th Cir. 2007); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th

Cir. 2007).  The court denies summary judgment on Zurwell's sex discrimination, hostile work environment, and retaliation claims.  Zurwell has not been fired or demoted, and there is very little by way of measurable damages available in this case.  Nevertheless, she has come forward with sufficient evidence to allow a reasonable jury to find that she was disciplined because of her sex, that she was subjected to a sexually hostile working environment, and that Hill's retaliated against her because she complained about sex discrimination directed at her and others.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and must resolve all

factual disputes in the non-moving party's favor.  See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

*Facts for Summary Judgment*

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to plaintiff as the non-moving party.  *Reeves*, 530 U.S. at 150.

Lois Zurwell began working at Hill's Pet Nutrition, a pet food producer, in 1993 as a temporary employee.  Zurwell specialized in computer information systems and from 1993 to 1995, she worked at Hill's analyzing spreadsheets, creating databases, and teaching employees at Hill's and other plants how to use the spreadsheets and databases.  Bender Zurwell Dep. 39-42.[1]  In 1995, Hill's staff suggested that Zurwell start a consulting business, which the company could hire as a contractor to continue performing the tasks Zurwell had been performing

---

[1]Several employees of Hill's have filed similar employment discrimination lawsuits, generating a number of judicial decisions so far.  Defendants deposed Zurwell in the separate case brought by Elizabeth Bright Bender.  To support her claims in this case, plaintiff Zurwell has submitted the deposition she gave in Bright Bender's case, which the court cites as the "Bender Zurwell Deposition."

as a temporary employee.  Zurwell took that advice and from 1995 to 1996, she worked for Hill's as an employee of Zurwell Consulting.  In 1996, Zurwell applied for and won a permanent technician position at Hill's.

Zurwell was assigned to the plant's stretch wrap team where she pulled bags of petfood from the packaging lines, performed quality checks, maintained the warehouse, and loaded semitrailers with pallets of petfood.  In December 1999, Zurwell referred a longtime friend of hers, Carol Isaacs, to Hill's for an open technician position.  Zurwell Aff. (III) Attach. 4.  In March 2000, Zurwell referred an associate of Isaacs, Elizabeth Bright (now Bright Bender), to Hill's for an open technician position.  Zurwell Aff. (III) Attach. 5.

Around the time that Hill's hired Bright, Hill's also hired Nathan Schneider. Zurwell Dep. 119.  Schneider and Zurwell worked on the stretch wrap team during the same shift.  In 2000, Zurwell, Schneider, and technician Mike Austin were working on three packaging lines.  When Austin took a break, Schneider refused to help Zurwell cover Austin's line.  *Id.* at 125.  He would finish the work on his line, "get off the truck, get on the telephone."  *Id.*  Sometimes Schneider's line malfunctioned, but he would not catch the problem.  The Hill's organizational structure delegated a fair amount of management authority to technicians and encouraged employees to voice their concerns, issues, and ideas directly to their teammates.  Zurwell was responsible for training Schneider on this task and gave him what she described as "constructive criticism."  *Id.* at 126.  Schneider did not

receive this criticism well and responded by shouting at Zurwell.  He refused "to communicate with women" but communicated well with men.  *Id.* at 127.  According to Zurwell, Schneider had "his little boy club going on and they buddy-buddy and do things."  *Id.*  Zurwell did not complain to her team leader Everett Jenkins or any member of management about Schneider's behavior right away.

During the spring and summer of 2003, Schneider, Zurwell, and two other men worked together loading semitrailers with pallets of petfood.  Zurwell Aff. (III) ¶ 68.  The three men would team up to load three trucks together while leaving Zurwell to load one truck by herself.  Zurwell Dep. 121.  She knew how to load the trucks because she had done it in the past.  But the company had switched from a paper shipping system to a computer shipping system since her initial training.  Schneider was responsible for teaching Zurwell how to use the computer system.  Zurwell asked for help, but Schneider refused to train her.  "He just looked at me, gave me a dirty look and he goes if you have any questions, ask."  *Id.*  She felt unsure about what specific questions to ask.  Zurwell also heard Schneider complain to other technicians that Zurwell was slow.  Zurwell Aff. (III) ¶ 71.  Later, women from another team taught her how to use the computer system properly.  Zurwell Dep. 121.

Sometime before September 2003, Zurwell was teaching a man new to the stretch wrap team how to operate the packaging lines.  Schneider announced over the radio that an extra technician was coming to help out the stretch wrap team.

Zurwell replied that she and the man she was training could use the extra person. Schneider got angry and began arguing heatedly with Zurwell about where to assign the extra person.  After this confrontation, Zurwell talked to team leader Everett Jenkins about her interactions with Schneider.  She reported that "he discriminates against all the women that he works with.  He won't look a woman in the eye.  And he treats women badly."  *Id.* at 124.  Zurwell told Jenkins that she wanted to move to a different team because Schneider's behavior was too much for her.  In September 2003, Jenkins moved Zurwell to a different shift within the stretch wrap team.  *Id.* at 122, 125.

Sometime in 2003, Zurwell was injured at work.[2]  She went to the hospital accompanied by another Hill's employee, Mike Keinath.  Keinath stayed in the examination room alone with Zurwell for several hours.  Zurwell felt "really uncomfortable" because she barely knew Keinath and was dressed only in a hospital gown.  *Id.* at 159-60.

Sometime in 2003, but before September 2003, Zurwell was divorced and began dating another technician at Hill's, Mike Verregge.  *Id.* at 6, 141-42; Bender

---

[2]Plaintiff and defendants stated in their summary judgment briefs that this incident occurred in July 2003 and cited pages 159 and 160 of Zurwell's deposition.  Pl. Br. 12; Def. Br. 4.  In her deposition, Zurwell testified that she thought this incident occurred sometime in 2003 but that she could not be certain of the month without looking at her notes, which she had provided to the defendants.  Zurwell's notes may have indicated that she went to the hospital with a work injury in July 2003, but neither side submitted those notes or any evidence to the court clarifying the month.  For purposes of summary judgment, the court assumes that the hospital trip occurred sometime in 2003.

Zurwell Dep. 102.  Between 2003 and 2004, several of the men at Hill's made comments about this relationship.  In December 2001, Zurwell and a female friend from the plant had gone Christmas shopping.  Zurwell had purchased a sex toy, a "love swing," for her then-husband.  Zurwell Dep. 140-41.  The friend mentioned Zurwell's purchase to other Hill's employees and "rumors spread through tech system like crazy."  *Id.* at 141.  When Zurwell began dating Verregge in 2003, another technician Joel Reece printed a picture of a "love swing" from the internet, showed it to Verregge and Zurwell, and said, "Mike, you ought to get one of these."  *Id.* at 142.  Zurwell later took the picture from Reece.

At her house one night, Zurwell made a tuna salad for Verregge during his dinner break.  When he returned to work, the men teased him about having tuna salad with Zurwell.  Employees also made comments to Zurwell about the tuna salad and "said it in like a sexual way."  *Id.* at 145.  A technician named Franklin (whose full name Zurwell could not remember) told her, "I don't see why you're with him.  He must have a big dick."  *Id.* at 160-61.  This same technician commented sometime at least after March 2004 at a product review meeting that he learned from a television show about an ingredient men could eat that would make semen "taste sweet."  *Id.* at 161.  Lisa Schrader, the team leader who replaced Jenkins after he left Hill's, was present and did not reprimand Franklin.  Zurwell responded, "Franklin, that's really sick."  *Id.* at 161.

While working in the shipping area on a hot day, Zurwell commented that she was "soaked all the way through." *Id.* at 146. Another technician, Jeff Winchester, said, "oh, wow, wait till I go back and tell Mike that I made you wet." *Id.* Later that night, Winchester put his arms around Zurwell while they were talking. Zurwell told him that made her uncomfortable and asked him to stop. Chris Lewis, another technician, told Zurwell that he dreamt about her, asked if she used massage oils, and indicated that his dreams about Zurwell were sexual. *Id.* at 134-35. When Zurwell was having a problem with some paperwork she was attempting to submit, another technician Mark Toney told her that "maybe all you need is a stiff dick." *Id.* at 138. Zurwell also felt uncomfortable with sexual comments that the men on the maintenance team made generally. *Id.* at 135-40.

The men on the maintenance team would often ignore maintenance requests that the women made. *Id.* at 182-83. Men on other teams would ask their female co-workers to make maintenance requests to avoid showing their own ignorance about maintenance to the men on the maintenance team. *Id.* at 183-84. Until the plant implemented twelve-hour shifts and assigned all cleaning responsibilities to the day shift in January 2006, the men Zurwell worked with would take the preventive maintenance tasks and "the women would be stuck with cleaning." *Id.* at 10-11, 118-19. Zurwell also heard about but did not see men sending or receiving pornography on Hill's email system. *Id.* at 158.

On November 11, 2003, Zurwell was working on one of the packaging lines doing quality control. The line's labeling software was set to automatically change at midnight the date stamped on the bags as they moved through the line. The line also had a device called a Labelaire, which regularly malfunctioned, that generated tickets for the pallets the bags were shipped on with a date that corresponded to the date stamped on the bags. That night, Zurwell was working with two other employees: one who had only two weeks of training and experience and another who did not speak English. The Labelaire malfunctioned. Zurwell had the non-English speaking technician preprint tickets to put on the pallets. According to Zurwell, she found and held about twelve pallets back from shipping that had bags with dates that did not match the tickets. Bender Zurwell Dep. 11. According to Hill's, sixteen pallets were mislabeled, including five that Hill's shipped to customers. Zurwell Dep. Ex. 3.

Aside from the pallets she held back for correction, Zurwell was unaware of any further problem that night. On November 19, 2003, team leader Jenkins told Zurwell that there had been an issue. Two women who worked on the next shift had noticed a stack of preprinted tickets lying around after Zurwell's shift on the evening of November 11 and the early morning of November 12. The men on Zurwell's shift frequently preprinted tickets and left them lying around. These preprinted tickets often had the wrong dates, and the two women "were tired of having to fix the problem." Zurwell Dep. 64-65. They had reported the problem

to Jenkins who told them to "let me know the next time that happens because I want to talk to them."  *Id.* at 65.

The two women reported the tickets they found on November 12 to Jenkins. On November 19, 2003, the day after Zurwell's friend Elizabeth Bright sued defendants for sex discrimination, Jenkins told Zurwell that there had been a problem with the date stamps.  Bender Zurwell Dep. 9-11.  On December 5, 2003, over three weeks after the incident and four days after Zurwell's friend Carol Isaacs filed an amended complaint against defendants for sex discrimination, Jenkins gave Zurwell a formal coaching, the first step in Hill's four-stage disciplinary process.  Zurwell Aff. (III) ¶¶ 73-74.  The first and unsigned page of the formal coaching was dated November 14, 2003.

At the first step, Hill's identified behaviors that the employee needed to improve.  At the second step, Hill's defined the problem in measurable terms, identified required corrective actions, and set a time-frame for improvement.  At the third stage, Hill's placed the employee on a paid one to three day "decision-making leave" to evaluate the employee's behavior and to have the employee write a statement of re-commitment to Hill's.  If the employee failed to improve the objectionable behavior, Hill's could fire the employee.

Zurwell refused to sign the formal coaching document because she felt "this is bogus.  I said you know that this happens every single night."  Zurwell Dep. 47.

Zurwell identified a number of men who had made the same error and were not disciplined:  Dillis Bolton, Mike Austin, Carl Parret, Paul Russell, Dave Caplinger, John Garden, Bill Sullivan, Mark Kemp, Bill Pebworth, Chris Lewis, Ron Price, Anthony Witter, and Steve Baker.  *Id.* at 58.  She identified another man, Mark Toney, who also made the same error and was not disciplined.  According to defendants, Hill's disciplined Toney on June 5, 2002, for failing to perform accurate quality checks on seventy-seven pallets.  Defendants submitted a copy of this action without the signature page which would have indicated that a supervisor had notified and reviewed the action with Toney (*i.e.*, that the discipline actually occurred).  Def. Rep. Ex. B at 23.  For summary judgment purposes, the court assumes that Toney performed inaccurate quality checks and was not disciplined.

On March 8, 2004, Jenkins put Zurwell into the second disciplinary stage for performing inaccurate quality checks on February 12, 2004.  Zurwell Dep. Ex. 7.  She was working with Mark Toney that night.  They missed one quality check. Zurwell Dep. 94.  Zurwell had taken a break; Toney had not performed the check in her absence.  When Zurwell came back from her break, she noticed that the pallets were missing a layer of bags.  They fixed the problem, and during his break, Toney corrected the pallets that had already gone to the warehouse.  *Id.*

Later in the shift, Zurwell discovered another problem with the way the pallets were being stacked.  The plant had recently switched that line from paper

bags to smaller plastic bags.  The employees running the line had not been instructed about how to arrange the new plastic bags on the pallet.  Zurwell's shift was one of the first shifts to use the plastic bags.  A man working the shift before Zurwell's had "guessed at the pallet pattern."  *Id.* at 113.  Zurwell and Toney held sixty-eight pallets back from being shipped and tried to correct the problem.  *Id.* at 111; Zurwell Dep. Ex. 7.  Several men were involved in the incident, but Jenkins disciplined only Zurwell.

Around the same time, but before Jenkins disciplined Zurwell the second time, Zurwell worked mandatory overtime on her old shift, which Nathan Schneider still worked.  Zurwell was scheduled to work the second half of the shift and came in to find that the woman she was relieving was working in the same area Schneider was working in.  Zurwell Dep. 129-30.  At some point, Zurwell noticed that Schneider and two other men left for lunch.  When they came back, one of the men, Dave Caplinger, said:

> I've talked to everybody back here and he said you know I care about you, I've worked with you for seven years and all this, he said, but Nathan is uncomfortable working with you and we want to know if you're here because you've got to be here or you volunteered to be here, but Nathan wants you to go home.

*Id.* at 130.  Zurwell, a single mother, had taken the shift to earn some extra money before taking leave for a surgery.  She became very upset, left, and called Jenkins in the middle of the night to report what Caplinger had said.  *Id.* at 130-31; Bender Zurwell Dep. 99-100.  Jenkins told her that "he'd take care of the

situation."  Zurwell Dep. 131.  The same day that he disciplined Zurwell the second time, Jenkins held a meeting with Schneider and Zurwell to address the problems she had reported.  Bender Zurwell Dep. 103.  According to Zurwell, when Jenkins disciplined her, he "smiled big like he was happy" and asked her if she was going to marry Verregge.  Zurwell Aff. (III) ¶¶ 75-76.

Initially, Zurwell lost her bonus for that quarter because of the second disciplinary action.  She filed a complaint with the Equal Employment Opportunity Commission (EEOC) on September 15, 2004, alleging sex discrimination and retaliation.  Zurwell Aff. (III) Attach. 11.  In September 2004, after filing her EEOC charge, Zurwell complained to the new human resources supervisor, Christy Shannon-Gerlach, about Schneider being "a sexist" and about Jenkins' decision to discipline her for things for which he did not discipline men.  Zurwell Dep. 97-98, 100; Shannon-Gerlach Dep. 6.  On February 26, 2005, Zurwell filed a complaint with the Indiana Civil Rights Commission that alleged sexual harassment in addition to sex discrimination and retaliation.  Zurwell Aff. (III) Ex. 14.  Around March 2005, management decided to withdraw retroactively the second disciplinary action and to pay Zurwell's withheld bonus with interest "to avoid any appearance of unfairness."  Dorantes Aff. ¶ 4.

Toward the end of 2004, Zurwell noticed that a wooden pallet on her line was causing problems.  In the course of pulling the pallet off, "it must have bounced and hit an [emergency] stop."  Zurwell Dep. 143.  The line shut down.

Mark Toney came around the corner and asked, "Lois, did your fat ass hit that E stop?" *Id.* The next day Toney put a sign stating "wide load" on Zurwell's truck. *Id.* She did not see it and drove around the plant where "everybody thought it was a big joke." *Id.* at 144. In February 2005, Zurwell reported Toney's comment to her team leader Lisa Schrader and to the Colgate-Palmolive help line. Zurwell Aff. (III) ¶ 92. Zurwell also reported the comments the maintenance men made and the three men who repeatedly called her "fat ass" after the incident with Toney. Zurwell Dep. 144, 148. Schrader relayed Zurwell's complaints to Christy Shannon-Gerlach, the human resources supervisor. Sara Lujan from Colgate-Palmolive came to Hill's to investigate. She interviewed several employees and lectured the maintenance men for about fifteen minutes on appropriate conduct. *Id.* at 153.

Sometime after the incident with Toney, Hill's fired Toney. Toney called Zurwell's house, told her that Hill's had fired him, and hung up. She felt scared "because I've seen Mark around, he's got friends and he's got enemies, and I didn't know for sure how he was going to react." *Id.* at 169. Zurwell called Sara Lujan, the investigator from Colgate-Palmolive. Lujan told Zurwell that the company could no longer do anything to protect her from Toney and that she should consider filing for a restraining order. *Id.* at 170.

After getting Toney's phone call, Zurwell checked her tires before leaving for work and took the interstate rather than local roads to work. *Id.* at 208-09.

Christy Shannon-Gerlach arrived half an hour after Zurwell, checked Zurwell's tires, and found them properly inflated. *Id.* at 209. Several hours later, another woman told Zurwell that two of her tires were flat. *Id.* at 209-10. Both tires had less than ten pounds of pressure per square inch. Zurwell had replaced one of the tires only four months earlier. She was able to drive to a nearby filling station to re-inflate the tires. Shannon-Gerlach reviewed the security video of the parking lot and found "nothing on the video to indicate that there was any tampering with her vehicle." Shannon-Gerlach Dep. 9. Additional facts are noted as needed, keeping in mind the standard applicable for summary judgment.

*Discussion*

I.   *Time Limits*

Because Indiana has a fair employment practices agency, the deadline for employees who have experienced unlawful employment practices to file a charge with the EEOC or the state agency is 300 days. See 42 U.S.C. § 2000e-5(e)(1); see generally *Russell v. Delco Remy Div. of General Motors Corp.*, 51 F.3d 746, 750-52 (7th Cir. 1995) (finding 300-day filing period applicable to Title VII race discrimination claims in Indiana). Zurwell filed her first sex discrimination and retaliation charge with the EEOC on September 15, 2004. Zurwell Aff. (III) Attach. 11. Defendants calculated that the charging period began on November 20, 2003. Discriminatory and retaliatory acts that happened between November 20, 2003, and September 15, 2004, provide a proper basis for Zurwell's sex discrimination

and retaliation claims.  Zurwell may, however, be able to present evidence of discriminatory or retaliatory acts that occurred before November 20, 2003, as background evidence to support timely claims.  See *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Zurwell has alleged that the sexual harassment she experienced created a hostile work environment.  She may rely on evidence of all harassing acts to support her hostile work environment claim so long as one harassing act occurred within the charging period.  See *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 769 (7th Cir. 2007) (reversing defense verdict and remanding for a new trial where district court erred by excluding relevant evidence of earlier harassment at Hill's, and recognizing that Title VII treats hostile environment claims "as one unlawful practice"); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007) (reversing summary judgment for defense on hostile work environment claim; recognizing that a hostile work environment EEOC charge properly encompasses all harassing acts if filed within 300 days of any harassing act).

II.    *Sex Discrimination Claim*

To support her sex discrimination claim, Zurwell relies on the two disciplinary actions she received for performing inaccurate quality checks.[3]  As

---

[3]Defendants argue that the first disciplinary action is untimely as a discrete action.  The first page of the document memorializing Zurwell's formal coaching indicates that the discipline was given on November 14, 2003.  The document

(continued...)

plaintiff points out, there is some overlap between the direct and indirect methods of proving discrimination.  Evidence relevant to one inquiry may be used to bolster a deficiency in the other.  See *Simple v. Walgreen Co.*, 511 F.3d 668, 670-71 (7th Cir. 2007) ("when a plaintiff in a discrimination case has direct evidence of discrimination as well as the indirect evidence required to make out a prima facie case under *McDonnell Douglas* he does not have to show that either approach, taken in isolation from the other, makes out a prima facie case – he can combine them"); *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996) ("Any demonstration strong enough to support a judgment in the plaintiff's favor if the employer remains silent will do, even if the proof does not fit into a set of pigeonholes.").  It is still necessary, however, to proceed through both analyses to determine what Zurwell has or has not supported with evidence.

The first step under both routes is determining whether the actions Zurwell complains of were sufficiently adverse to warrant statutory protection.   See 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination that affects an employee's "compensation, terms, conditions, or privileges of employment"); *Pantoja v. American NTN Bearing Manufacturing Corp.*, 495 F.3d 840, 847 (7th Cir. 2007) (affirming summary judgment on race discrimination claim; recognizing that

---

[3](...continued)
describes the discipline involved as a conversation between a team leader or manager and Zurwell.   Jenkins had this conversation with Zurwell on December 5, 2003, which fell within the charging period beginning November 20, 2003.   This portion of the claim is timely, at least for purposes of summary judgment.

criticism and disciplinary measures are adverse employment actions for disparate treatment claims only if plaintiff demonstrates that the actions affected plaintiff's compensation, terms, conditions, or privileges of employment).  Zurwell's first disciplinary action, the formal coaching, was not sufficiently adverse because it did not affect her compensation, terms, conditions, or other employment benefits.

The second disciplinary action was sufficiently adverse because it caused Zurwell to lose a non-discretionary bonus of approximately $633.  Being denied a bonus that is wholly within the employer's discretion to award is not materially adverse.  See *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (affirming summary judgment for defendant where bonus lost was a wholly discretionary payment); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) (same).  The bonus at issue here did not fit the description of "sporadic, irregular, unpredictable, and wholly discretionary."  See *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000).  At Hill's, quarterly bonuses were earned based on standardized performance measures, not dispensed solely through Hill's discretion, see Keinath Aff. ¶ 9, and were a sufficiently reliable part of an employee's compensation that the court cannot grant summary judgment on defendants' theory.  See *Lewis v. City of Chicago*, 496 F.3d 645, 653-54 (7th Cir. 2007) (cautioning against excessive reliance on labels to distinguish bonuses from raises for this purpose); see also *Farrell v. Butler University*, 421 F.3d 609, 614 (7th Cir. 2005) (finding that district court properly treated university's teaching award as raise rather than discretionary bonus, so plaintiff established a prima

facie case of discrimination).  Hill's later paid Zurwell the bonus with interest, but that later action does not require the grant of summary judgment.  See *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006) (reversing summary judgment for defendants on sex discrimination claim; finding that an employer may not circumvent Title VII by withdrawing its adverse action "whenever it becomes clear that the employee intends to pursue her claims in court").

Under the direct method, Zurwell must present evidence that Hill's was motivated to discipline her because she is a woman.  See *Phelan*, 463 F.3d at 779-80 (reversing summary judgment for defendants on sex discrimination claim). That evidence can be direct or circumstantial (*i.e.*, the "convincing mosaic" route). *Id.*; *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736-37 (7th Cir. 1994). Zurwell has not presented any direct evidence of sex discrimination, but she has presented circumstantial evidence that could lead a jury to infer that Hill's disciplined her because she is a woman.  The Seventh Circuit has recognized three categories of persuasive circumstantial evidence:  (1) dubious coincidences, such as suspicious timing, ambiguous statements, and comments or behavior directed at other employees in the protected group; (2) evidence that the employer systematically treated employees outside the protected class better; and (3) evidence that the employee was qualified and that the employer's reason for treating her differently was pretext.  See *Troupe*, 20 F.3d at 736.

Zurwell relies on evidence in the second category to prove that Hill's discriminated against her by giving her a performance agreement.  According to Zurwell, seven other men – including Chuck McConnell, Bill Pebworth, and Mark Toney – were involved in setting and following the incorrect pallet pattern for the new plastic bags.  Zurwell Dep. 93, 111, 113.  She was the only woman involved and was the only one disciplined for the incident.  Based on that evidence and the evidence that Hill's routinely did not discipline men for inaccurate quality checks, a reasonable jury could find that Hill's discriminated against Zurwell because she is a woman.  The formal coaching was not actionable, but Hill's is not entitled to summary judgment on Zurwell's sex discrimination claim based on the performance agreement.

III.    *Hostile Work Environment Claim*

Zurwell also claims that Hill's subjected her to a hostile work environment based on sexual harassment.  She must show that:  (1) she was subjected to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive to interfere with her work performance and to create an abusive work environment; and (4) there is a basis for employer liability.  See *Robinson v. Sappington*, 351 F.3d 317, 328-29 (7th Cir. 2003) (reversing summary judgment in part based on one supervisor's harassing behavior).

To begin, Zurwell has complained of at least one harassing act within the charging period.  Sometime after March 2004, Zurwell was present during a product review meeting when a technician named Franklin (Zurwell could not remember his surname at her deposition) reported that he had learned from a television show about an ingredient men could eat that would make semen "taste sweet." Zurwell Dep. 161.  Whether this comment would be actionable in isolation is not the point here.  Zurwell has come forward with evidence of a number of incidents and types of harassment of which this comment was only a part. Because at least this one harassing act falls within the charging period, Zurwell may also rely on evidence of harassment that occurred outside the charging period to support her hostile environment claim.  See *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115-20 (2002).

Zurwell has offered evidence of a number of specific harassing acts to support her claim:  several technicians repeatedly made lewd comments about her relationship with co-employee Mike Verregge; Chris Lewis told her that he had sexual dreams about her and asked if she used massage oils; the male technicians routinely left the female technicians to perform cleaning tasks; the maintenance men repeatedly ignored maintenance requests that Zurwell and other female technicians made; the male technicians repeatedly made sexual remarks about women over the radio system; Jeff Winchester put his arms around her during a conversation; the male technicians repeatedly asked the female technicians to make maintenance requests to avoid showing their own ignorance; Mark Toney

commented on Zurwell's size and put a "wide load" sign on her truck when he did
not treat men that way; and Mark Toney told her that "maybe all you need is a
stiff dick" to solve a problem with some of Zurwell's paperwork.  Zurwell also made
several complaints about Nathan Schneider:  that he refused to work with or train
her but worked readily with and trained men; that he refused to look her and
other women in the eye; and that he had another technician tell her to go home
because Schneider could not work with her.[4]

A reasonable jury could find that those harassing acts were unwelcome,
were related to her being a woman, and in totality, were sufficiently pervasive to
alter her working conditions and to create an abusive working environment.  See
*Valentine v. City of Chicago*, 452 F.3d 670, 681-82 (7th Cir. 2006) (reversing
summary judgment on hostile environment claim where fellow employee's alleged
harassment was frequent and humiliating); *Haugerud v. Amery School District*,
259 F.3d 678, 694-96 (7th Cir. 2001) (reversing summary judgment for employer
on hostile work environment claim where supervisors and fellow employees
questioned plaintiff's ability to do her custodial job because she was a woman and
repeatedly instructed men not to help women in tasks requiring multiple persons);
*Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999) (reversing summary

---

[4]Zurwell has also relied on several incidents that cannot support her hostile
work environment claim.  There is no evidence that having to wait with a male
employee in a hospital emergency room while wearing only a hospital gown was
anything but an annoyance.  Zurwell had never actually seen any pornography
around the plant, and she cannot seriously contend that racy pictures of two
technician's spouses that Zurwell herself helped generate during a holiday party
contributed to her hostile work environment.

judgment for employer on hostile work environment claim where evidence revealed "broader pattern of behavior hostile to women"; recognizing that discriminatory nature of specific hostile behavior that is not ostensibly sex-based may be inferred from a pattern of behavior hostile to women).

Hill's will be liable for the harassment by Zurwell's fellow technicians only if it was negligent in failing to prevent or remedy the harassment against Zurwell. See *Haugerud*, 259 F.3d at 700. Zurwell complained to her team leaders Everett Jenkins and Lisa Schrader about her interactions with Nathan Schneider, about the frequent comments the maintenance men made, about Mark Toney commenting on Zurwell's physical size and putting a "wide load" sign on her truck, and about three men who repeatedly called her "fat ass" after the incident with Toney. Hill's fired Toney in response to Zurwell's complaints. Sara Lujan briefly lectured the maintenance men about appropriate workplace conduct. Jenkins also attempted to prevent Schneider and Zurwell from working in the same area by having Zurwell change shifts, but that attempt was apparently ineffective.

Through Zurwell's and other women's complaints, a jury could find that Hill's was on notice that the plant was a hostile work environment for women. There is no evidence that Hill's took any other steps to prevent or manage the hostility Zurwell experienced. Viewing the evidence through the lens of summary judgment, a reasonable jury could find that Hill's was negligent in failing to

prevent or remedy the harassment against Zurwell.  Hill's is not entitled to summary judgment on Zurwell's hostile work environment claim.  See *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d at 768-71 (reversing defense verdict for Hill's on Elizabeth Bright's hostile environment claim at same factory); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d at 386-87 (reversing summary judgment for Hill's on Carol Isaacs' hostile environment claim at same factory).

IV.     *Retaliation Claim*

To support her retaliation claim, Zurwell presents evidence of several timely actions:  (1) the disciplinary actions she received for performing inaccurate quality checks; (2) Dave Caplinger telling Zurwell that Nathan Schneider wanted her to go home because he could not work with her; and (3) the deflation of her car tires.  Again, the first step under both the direct and indirect routes is determining whether the actions were sufficiently adverse to warrant statutory protection.

Plaintiffs claiming retaliation do not need to show that the adverse actions they complain of were related to their employment or even occurred at the workplace.  For retaliation claims, unlike discrimination claims, an adverse action is material if it probably would have dissuaded a reasonable employee from complaining about the underlying discrimination.  *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 68-69 (2006); see also 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against employees for opposing unlawful

employment practices or making charges, testifying, assisting, or participating in any manner in any related investigation or proceeding).  In all cases, however, "normally petty slights, minor annoyances, and simple lack of good manners" are not deemed sufficient to dissuade an employee from reporting discrimination. *Burlington Northern*, 548 U.S. at 68.

Both disciplinary actions Zurwell complains of here – the formal coaching and the improvement plan – were sufficiently adverse to support her retaliation claim.  See *Pantoja v. American NTN Bearing Manufacturing Corp.*, 495 F.3d 840, 849 (7th Cir. 2007) (reversing summary judgment on retaliation claim where disciplinary warnings were sufficiently adverse to support retaliation claim).  The next action Zurwell complains of – being told by her teammates that a man whose behavior she complained about refused to work near her and that her teammates wanted her to go home – is not sufficiently adverse.  There is no indication that Zurwell lost pay because she went home, see Def. Ex. 2 at 2-3, or that any reasonable employee would have been dissuaded from complaining to management about the underlying discrimination.  The first thing Zurwell did when she got home in the middle of the night was call her supervisor, Everett Jenkins, who was not working that night, to report what had happened.  Bender Zurwell Dep. 99-102; Zurwell Dep. 131-32.

Zurwell also points to the deflation of two of her car tires as evidence of a threat of physical harm from Mark Toney.  Toney called Zurwell at home, told her

that Hill's had fired him, and hung up before Zurwell could respond.  The next day, Zurwell parked her car at the factory and it had two nearly flat tires when she returned.  The court assumes that a jury could find the two incidents related and sufficiently adverse.  But Hill's – after firing Toney – could no longer be held responsible under Title VII for any retaliatory acts attributed to Toney.  See generally 42 U.S.C. § 2000e(b) (defining "employer" for Title VII purposes as "a person engaged in an industry affecting commerce . . ., and *any agent of such a person*") (emphasis added); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) (recognizing that under Title VII, an employer "may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment").  If Toney was not responsible, there is no evidence of who else might have been responsible, let alone a basis for holding Hill's responsible for the vandalism.

Zurwell has not presented any direct evidence that the disciplinary actions were retaliatory, but she has presented circumstantial evidence that could lead a jury to infer that Hill's retaliated against her.  She relies on the first category of circumstantial evidence the Seventh Circuit recognized in *Troupe*:  dubious coincidences, such as suspicious timing, ambiguous statements, and comments or behavior directed at other employees who engaged in protective behavior.  See *Troupe*, 20 F.3d at 736.  Zurwell referred both Carol Isaacs and Elizabeth Bright to Hill's in 1999 and 2000.  Bright quit working at Hill's in November 2002, filed an EEOC charge in January 2003, and sued defendants in this court on

November 18, 2003.  Isaacs filed an EEOC charge in July 2002 against Hill's alleging sex discrimination and retaliation; filed an EEOC charge against Colgate-Palmolive in January 2003 alleging race and sex discrimination, sexual harassment, and retaliation; sued defendants in March 2003; and filed an amended complaint on December 1, 2003.

Throughout this time, Zurwell vocally supported Bright and Isaacs at the plant.  She asked another technician to train Bright and to look out for her. Bender Zurwell Dep. 106.  She defended Bright and Isaacs in front of team leader Everett Jenkins when other technicians made derogatory comments about them or used them as scapegoats.   Zurwell Dep. 172-75.   In a deposition on November 10, 2003, Isaacs made discrimination and retaliation allegations against Jenkins.  Zurwell Aff. (III) Ex. 7 at 89, 127-32, 191, 209-10, 229-37, 250-52.  Eight days later, Bright sued defendants.  Jenkins first told Zurwell there had been a problem with her quality checks on November 11 and 12 the day after Bright sued.   Four days after Isaacs filed an amended complaint, Jenkins disciplined Zurwell for behavior for which men routinely were not disciplined. Based on this evidence of suspicious timing, a reasonable jury could infer that the first disciplinary action was retaliation for Zurwell's opposition to the alleged discrimination and harassment of Bright and Isaacs.  See *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1314-15 (7th Cir. 1989) (reversing summary judgment for employer; relying on the "'telling' temporal sequence" of events leading to the adverse action).

The same holds true for the second disciplinary action.  Shortly before Jenkins disciplined Zurwell the second time, Zurwell had reported to Jenkins that her teammates sent her home because Schneider (the man she had accused of being sexist) refused to work with her.  Jenkins disciplined Zurwell the same day he held a meeting with Schneider and Zurwell to discuss Zurwell's complaints against Schneider.  A reasonable jury could infer that the second disciplinary action was retaliation for Zurwell's complaints about Schneider's behavior.  Hill's is not entitled to summary judgment for Zurwell's retaliation claim.


V.      *Colgate-Palmolive Company*

In addition to suing Hill's, Zurwell sued Colgate-Palmolive, Hill's parent corporation.  Twice, the Seventh Circuit has held as a matter of law that Colgate-Palmolive is not a proper defendant in these closely-related discrimination suits against Hill's by Zurwell's co-workers at Hill's.  See *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 771 (7th Cir. 2007); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007).  In *Isaacs*, the Seventh Circuit very briefly commented on Colgate-Palmolive's lack of liability as the parent corporation of Hill's: "As the district court remarked, Colgate was not Isaacs' employer, and she offers no reason why an investor should be liable for Hill's acts.  Cf. *United States v. Bestfoods*, 524 U.S. 51 (1998).  We need not mention Colgate again."  485 F.3d at 385.  In *Bright*, the Seventh Circuit reiterated that Colgate-Palmolive was not liable in a discrimination suit brought by a Hill's employee where the plaintiff did not

prove that Colgate-Palmolive caused the wrongful conduct or that its actions triggered shareholder liability:

> We could have cited oodles of decisions for that proposition but chose to cite only one: *United States v. Bestfoods*, 524 U.S. 51 (1998). The portion of Bright's brief dealing with the claim against Colgate-Palmolive ignores *Bestfoods*. What it says instead is that Colgate-Palmolive must have been Bright's employer – even though she was hired, paid, and supervised by the staff of Hill's Pet Nutrition – because Colgate-Palmolive promulgated policies that its subsidiaries were supposed to use to comply with Title VII. That a parent corporation has tried to prevent violations of law (the better to protect the value of its investment) hardly makes it directly responsible *for* those violations! (Bright does not contend that any of the policies that Colgate-Palmolive told its subsidiaries to use directly violated Title VII, counseled unlawful acts, or even increased the probability that unlawful acts would occur.) Nor does it matter that managers at Hill's Pet Nutrition told managers at Colgate-Palmolive about the problems at the Richmond plant. Title VII applies to *employers*, not to investors who know about what employers are doing. That Bright complained directly to personnel at Colgate-Palmolive does not make it an employer, any more than complaining to a Member of Congress would have made the Senator or Representative her employer. An email to Warren Buffett would not make him personally liable for wrongs committed by corporations in the Berkshire Hathaway portfolio.

510 F.3d at 771.   Colgate-Palmolive is entitled to summary judgment on all claims.

*Conclusion*

For the foregoing reasons, the court GRANTS summary judgment for defendant Colgate-Palmolive on all claims because Colgate-Palmolive was not Zurwell's employer. The court GRANTS summary judgment for defendant Hill's on Zurwell's FMLA claim, but DENIES summary judgment for defendant Hill's on

Zurwell's Title VII discrimination, hostile work environment, and retaliation claims.  The court will set a new trial date after conferring with counsel.


     So ordered.


Date: July 23, 2008

_David F. Hamilton_
_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Ellen E. Boshkoff
BAKER & DANIELS
ellen.boshkoff@bakerd.com,paula.calhoun@bakerd.com

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Susan W. Kline
BAKER & DANIELS LLP
swkline@bakerd.com,robin.osbourn@bakerd.com

Joseph C. Pettygrove
BAKER & DANIELS LLP
joseph.pettygrove@bakerd.com,donna.poteet@bakerd.com